STATE v. WHITLEDGE et al.

No. 43757.

Supreme Court of Missouri.
Division No. 2.

April 12, 1954.

R. P. Smith, Strom & Spradling, Cape Girardeau, for appellants.

John M. Dalton, Atty. Gen., Grover C. Huston, Asst. Atty. Gen., for respondent.

LEEDY, Jr., Judge.

■ William P. Whitledge, Sr., and William P. Whitledge, Jr., were convicted in the Circuit Court of Cape Girardeau County of obtaining property under false pretenses, in violation of Section 561.370 RSMo 1949, V.A.M.S. Each was sentenced to two years' imprisonment in the penitentiary in accordance with the verdict, and they appeal. The only points briefed by them are: (1) That, as to Wm. P. *Jr.*, the conviction is not warranted and cannot stand because the evidence is insufficient to support the verdict against him; and (2) that instruction No. 3 was prejudicially erroneous in certain enumerated respects. The state contends that neither question is open to review because not preserved by the motion for new trial. The record sustains the state as regards the instruction issue, no complaint against No. 3 having been assigned by the motion for new trial, so ob-

viously the attack made for the first time on this appeal cannot be considered. But we reach a different conclusion with respect to the reviewability of the question of the sufficiency of the evidence to support the verdict as against Wm. P. Jr., who, alone, makes the challenge.

■ The state's brief expressly concedes that at the close of the state's case in chief, and again at the close of all the evidence, Wm. P. Jr., unsuccessfully "questioned the sufficiency of the evidence" as to him. By referring to the record, we discover that such challenge was made by "motion to dismiss" on the stated ground "that the state has not shown any evidence at all to connect him [Wm. P. Jr.] with the facts charged in the indictment." The state's position is thus stated in the brief: "We failed to find in appellants' motion for a new trial an assignment of error to the effect that the court erred in overruling appellants' demurrer to the evidence. By failing to call this matter to the attention of the court it is our contention the sufficiency of the evidence is not now the subject of review here." True, the motion for new trial did not in terms complain of the overruling of a "demurrer to the evidence," but the motion did assign error in the overruling of Wm. P. Jr.'s "motion to dismiss the indictment and discharge said defendant at the close of all the evidence." The state's position evidently overlooks the change wrought in the practice by the adoption of Mo. Supreme Ct. rule 26.10, 42 V.A.M.S. 113, (effective January 1, 1953, and hence in full force at the time of trial, April 13, 1953), which rule abolished motions for directed verdict, and substituted in their place motions for judgment of acquittal. Rule 26.10 reads as follows: "Motions for directed verdict are abolished and motions for judgment of acquittal are substituted in their place. The court either on motion of a defendant, or its own motion, shall order entry of judgment of acquittal of one or more offenses charged by indictment or information if, after the evidence on either side is closed, the court concludes as a matter of law that such evi-

dence is not sufficient to sustain a judgment of conviction of such offense or offenses. ·If a defendant's motion for judgment of acquittal at the close of the state's case-in-chief is not granted the defendant may offer evidence without prejudice to such motion." Had the motion of Wm. P. Jr., been designated as a motion for judgment of acquittal instead of one to dismiss, it would have been in compliance with this rule. The circumstance that the motion was ineptly styled as the latter did not so change its character as to deprive movant of the right to have it considered as a motion for judgment of acquittal under rule 26.10. The question having been raised at the trial, preserved by the motion for new trial and carried forward in the brief filed here, it is legitimately the subject of review on this appeal.

The Whitledges, father and son, operated an automobile business in Cape Girardeau under the name of W & W Motor Company. They customarily financed automobile transactions, both wholesale and retail, through Jacob Goodman, an individual doing business as Goodman Finance Company (hereinafter designated as Goodman). Shortly prior to the date of the transaction out of which this prosecution arose, Wm. P. Jr., had been required by Goodman to withdraw from the management of W & W Motor Company as the condition upon which he (Goodman) would continue to do business with it; that is, to purchase instalment notes and mortgages taken by the company in payment of motor cars sold to its customers, as well as the financing of so-called floor plan mortgages.

On or about March 19, 1951, Goodman (through his manager and agent, Gammon) acquired by purchase from W & W Motor Co., in the regular course of business, and believing the paper to be valid, a $964.80 instalment note together with a chattel mortgage securing the same upon a 1947 Pontiac automobile, both instruments purporting to have been executed by "Willard Miller" on March 19, 1951, to W & W Motor Company in payment of the balance of the purchase price of the Pontiac sold the maker by the motor company. Three monthly instalments each were paid on the note (by Whitledge, Sr., personally, as it subsequently developed) before it was discovered (as Whitledge, Sr., expressly admitted) that the note and mortgage were spurious. No such sale had been made, and Willard Miller was not the owner of the car. On the contrary, the Pontiac upon which the chattel mortgage purported to be a lien had been sold by the motor company to a customer living in an adjoining county. The bank draft given in payment of the latter purchase and which bore the endorsement of Whitledge, Sr., and W & W Motor Company, was introduced in evidence. It was dated March 13, 1951.

All negotiations with Goodman (who acted through the agent and manager just mentioned) and the resulting sale, transfer and assignment of the fraudulent note were conducted on behalf of the motor company by and through Whitledge, Sr. To show the connection of Bill, Jr., (as he was referred to by most of the witnesses) with the transaction, the state called the ostensible maker of the note and mortgage, "Willard" Miller. His testimony was to the effect that although his middle name was Willard, he is not so known, but rather as Leo, his first name; that on March 19, 1951, he was employed as a telephone operator by Snappy Cab Company at Cape Girardeau, which was owned by Bill, Jr., and another; that on that date, the Snappy Cab Company having only three cabs in operation, Bill, Jr., solicited him to buy a 1948 Pontiac which was at W & W Motor Company; that witness agreed to buy the car and drive it himself as a cab; that thereupon Bill, Jr., "handed me a blank note [and mortgage] and had me sign it;" that they then went out to the motor company and looked at a two-tone, four-door, green, 1948 Pontiac; that after looking at it he returned to the cab station and went to work; that later that day Bill, Jr., "taken the mortgage to the lot there to put the deal through on the car and came back later, I don't recall the time, but he said, he thought his father said 'the deal was no good and couldn't sell it that way,' and he was supposed to have torn the mort-

gage up at that time. * * * I asked him and he said he had destroyed it." The witness further testified that he heard no more about the note and mortgage until two or three months later when he was contacted by Goodman's manager; that thereafter he asked Bill, Jr., about the note and he was told that his father had handled it and he (Bill, Jr.) didn't know anything about it. With reference to a conversation he had with Bill, Sr., the witness testified "he told me he needed the money at that time and that was why he run the mortgage through the finance company and had to take care of it himself." While State's "Exhibit A" was introduced in evidence, it has not been brought here. From the record we understand it was a combined form of note, chattel mortgage and "buyer's statement" in one instrument. The witness stated that no "kind or model" of car was put down on the chattel mortgage, because he signed the instrument in blank. He identified the handwriting appearing in the "buyer's statement" and "chattel mortgage" portions of the exhibit as being that of Bill, Jr.

On cross-examination, the witness testified as follows:

"Q. Now, Leo, this Exhibit A, is that your signature on the note and the mortgage there? A. That is my name but I didn't sign it that way.

"Q. You didn't sign this Willard Miller on that note? A. No, sir.

"Q. Or the Willard Miller on that mortgage? A. I did not.

"Q. And you say you did sign a note and mortgage in blank for Bill, Jr.? A. Yes, sir.

"Q. And Bill, Jr., told you later that note and mortgage had been torn up? A. That's right.

"Q. Have you ever seen the one you did sign since Bill, Jr., told you it had been torn up? A. No, sir.

"Q. So far as you know it was torn up? A. Yes, sir.

"Q. And this one you didn't sign? A. I did not."

The only witness called on behalf of defendants was Bill, Jr., whose testimony leaves much to be desired in the way of clarity and details. He testified (among other things) that he terminated his connection with the motor company in February, 1951, and that this was because the finance company required it; that he got out and stayed out; that in February and March, 1951, he was one of the owners and operators of Snappy Cab Company, and that he proposed to Miller, who was then in the employ of the cab company, that the latter buy a car and operate it in the cab business; that at that time Miller did sign a note and mortgage to purchase the car, but he denied that "Exhibit A" was the note and mortgage so executed, or that he (witness) had any connection with the '47 Pontiac, the prospective sale to Miller being a '48.

On cross-examination, he admitted having been convicted in 1951 of making a false statement in an affidavit for a certificate of title to a motor vehicle, and in 1952 for defrauding a restaurant owner. He admitted that the filled-in portion of the "buyer's statement" (part of Exhibit A, the regular and usual form of note, chattel mortgage and buyer's statement used by Goodman) was in his own handwriting; that he had personally filled in the information appearing therein respecting Miller, and that he did so at the request of his father (Wm. P. Sr.); that the latter did not disclose to him his purpose in that connection. Witness explained that he regarded it as a credit statement regarding Miller, but, nevertheless, admitted that in answer to the question, "Employed by," he wrote "United Cab Company of Cape Girardeau," and failed to put down anywhere on the statement that Miller was employed by Snappy Cab Company, of which witness was one of the owners. His explanation of the reason the sale to Miller did not go

through was that his father "didn't think he could pay for it."

■ The inferences to be drawn from the facts admitted by Bill, Jr., when taken in connection with the other evidence in the case, were sufficient to warrant the jury in concluding that defendants were acting in concert in foisting upon Goodman the fraudulent evidences of indebtedness charged in the indictment. First, there is the circumstance that the transaction with Miller coincided in point of time with the negotiation of the paper to Goodman. Who would believe the legitimacy of a transaction by which the prospective purchaser of a car executes his note and secures it by a chattel mortgage upon the subject of the sale before such sale has been assented to by the seller? Such a course of action is so contrary to normal business practices as to make it suspect upon the mere narration thereof. Miller was working for Snappy Cab Company at the time he signed the note and mortgage, but the name of his employer was falsely represented in the buyer's statement. Bill, Jr., was admittedly acting at the request of his father in filling out the questionnaire touching Miller, and this without inquiry, explanation or comment by either party as to its intended use or purpose. These instruments were never redelivered to the maker. The jury would have been justified in finding that the note and chattel mortgage which Miller said he signed were never destroyed, but were, in fact, the very ones introduced in evidence as "Exhibit A," it being recalled that this exhibit consisted of a single form in three parts: the buyer's statement (filled in by Bill, Jr.), note and chattel mortgage. There was substantial evidence upon which to predicate a verdict of guilt as to both defendants, and so there was no error in holding the state made a submissible case against Bill, Jr.

We have examined the record proper, and find it regular and sufficient. Judgment affirmed.

All concur.